Your Honor, this case comes to you as a First Amendment conspiracy case. It's an unusual case because what is this counsel's interpretation after 30 years of experience of what the Internal Revenue Service was pursuing in this case was an effort to work and make a First Amendment exception to the income tax laws. I stood before this court 15, 20 years ago and the case was Fifth Amendment, United States versus Trojan, in which the court held there was no Fifth Amendment exception to the tax laws for the IRS. Are you talking about an instruction to the peditory or an instruction to the grantory? On the issue of the First Amendment, I'm starting off my argument by trying to give a background of, I'm going to make a distinction here between what I think the government's argument's going to be on commercial speech that has no protection My concern is this, that I don't think there is any right to an instruction to the grantory. It would just be the peditory where there might be a real issue. And so I want to sort out in my own mind what we're talking about. You caught me completely by surprise, but I think I understand where you're coming from. It can become an issue with a pedigree, a First Amendment violation, if you're submitting to them the issue of whether the speech resulted in sudden, imminent criminal lawless action, such as under Brandenburg. I've never seen what you're talking about, about the grand jury being instructed, but I haven't seen any case law that says the grand jury doesn't have to be instructed. So that's probably something I missed, but I came along after they were indicted. Okay, now I understand. I never made any motion that said that the indictment was improper because the grand jury was improperly instructed on the First Amendment. Mr. Eisen, maybe you can help me with the roadmap on this. You have placed a really large number of issues before the court. There's obviously not time to cover, but a small fraction of them. What are you going to focus on? I'm going to try to focus on the First Amendment. Okay. Because it's a big hole to dig out of. Okay, very good. I'm familiar with the court's decision in Alvarez, and I want to start this balance here. I'm aware of that one. You have Dahlstrom, which I argued years ago, the Judge Ferguson. That was a commercial speech case. You have, arguably, Freeman and Schiff, which are... Well, Alvarez, of course, dealt with a situation where the person got no benefit whatsoever. It doesn't apply where the court has said the First Amendment does apply, or there's possible perjury, or fraud, or any benefits are derived. So that doesn't really help you there. Let me jump on that immediately. Okay, please do. The benefit my client got was the benefit you would get if you were an author, and you were reciting information, and you got $30 or $40 for your book, and you recited in there how the IRS reacted to certain filings people had made. You recited in there about how the IRS reacted when they gave people certain letters. You acted informationally and reported it, and you got a $40 book fee. Now, there were some other issues here about selling of a trust for $500, which had some benefit to the taxpayer beyond taxes. Well, let's stick with your $40 analogy. That's 40 bucks. I agree it's not very much, but it's something. That's on Alvarez. That's on Alvarez. My distinction is the $40, you looked at it, and that money is going to informational reporting. That money is not the thousands of dollars that you get from the big law firm, Jenkins and Gilchrist, that goes bankrupt because they plan people's taxes. That money is not even the $200, $300 somebody gets and sits down and prepares returns. And I want to point this out. In Freeman, they prepared returns. In Schiff, they prepared returns. My client did not prepare any returns. Now, there was within the ambit of group of the publishers here, Teresa Giordano. You're saying that there's nothing more here than advocacy? Is that basically what you're saying? It's not that simple, unfortunately, Your Honor. There's a couple of things the government can stab me, or try to stab me with. Number one, there is advocacy. But number two, somebody within my client's organization wrote letters to IRS. But they aren't helping people falsify tax returns. That's what you're saying. No, they're not helping. And I'm going to jump on it specifically and tell you they're not helping them. Aren't your clients giving people a road map as to how to falsify their tax returns? The answer to that is that's what the government claims. But I say that that doesn't make any difference. I don't think the evidence supports that. But let's look at the evidence in the light most favorable to the verdict. And say, let's assume the evidence supports that. They still didn't get over the sudden imminent criminal action in Brandenburg that was cited in Alvarez by the panel in the in-bank court here. And that is that there was at least three weeks delay between the time any of the government's witnesses read this book and they went and filed any return that the government objected. There's no evidence in the case. That's pretty imminent as far as filing a return goes. I mean, if you sell a book that advocates an illegal act, and the person buys the book in 1986, and then five, ten years later when the issue comes up for them, they look at their old book and act on it. Well, there I can see where you'd have a First Amendment defense. But my gosh, it takes quite a lot of time to prepare a tax return. Three weeks doesn't sound like much. Well, nobody ever threw me that pitch. But what I'll tell you is that I swing and I'm going to hit it because I'm going to tell you that three weeks is too long for sudden imminent criminal action. You do, right. Unless you want to write a commercial exception and say, over here was a sudden immediate action. Fire in the theater. And everybody's just, ah! And runs out and tramples the neighbor next to them, knocks the popcorn down, tramples the baby and all that. Some criminal actions like tossing a molotov cocktail in the theater can be accomplished fast. And some criminal actions, like a lot of kinds of fraud, can't be accomplished fast. So, and filing a nonsense tax return is in the latter category. You just can't do it that fast. So I'm still wondering why three weeks is not imminent. If you want to craft that exception, I'm cooked. Because that's my record. But I disagree with you. It's very dangerous to craft that exception on imminent and lawless activity. Give me more. It's not like punching somebody or throwing a molotov cocktail. It takes more time than that to do the criminal work. No one has ever said, we are going to give the government a First Amendment exception because it takes a little longer for somebody to commit a criminal action because this is taxing. You are working your way to a First Amendment exception for the Internal Revenue Service. If this panel wants to give it to them, I can't stop them. But I'll argue vehemently against it. They do not need it. They don't have the right to it. What would be the bright line rule that you would urge upon this court? Since what we say will be in black and white and theoretically relied upon by others. If three weeks is too long, what would be imminent in the context of a tax return? I agree with Judge Kleinfeld. This is not something that happens as immediate as one throwing a molotov cocktail in a crowded theater. So would two weeks be imminent or one week? What kind of bright line rule are you urging? I would give you this bright line. You sit down with a person, what you utter to them is going on their tax return. So basically, a book doesn't apply. I could if I sat down with this and I said, you know what, I've got me a good manual here to do somebody's phony tax return here. Let's go over this now and let's fill out some terms. So you're saying that they have to take the book and walk through it and instruct them through the book. You can't just have the book out there independently without the intermediary. Yes. One of the reasons for the sudden immediate and the heightened scrutiny test that Judge Ferguson and the other judges applied in Dahlstrom to the commercial speech, that was a seminar, was simply when they acquitted the defendants on appeal, they looked at it and they said that there was some unclear law, which we have, but also they said you had to put the sudden and imminent test to it. That's your law. No one's reversed Dahlstrom. Contrary to what the government continues to claim in these cases, it hadn't been reversed. And the Freeman and Schiff don't help them because they sat down with people. I'm representing that to the court. I read those opinions. They sat down with people. They soaked money out of them, much more than a book, and they gave them direct tax advice, which is covered by 72061 in the Internal Revenue Code, which has counseled and prepared false income tax return for another. I think that's 72062 of 26 U.S.C. Now, with that in mind, the court is wrestling now with a situation where somebody lied. It's going up to the Supreme Court about their valor. Well, did my client lie about taxes? Well, I don't think so. My client, what she reported was simply what the IRS sent the client and the people the client knew. They sent out letters with codes on them, the IRS codes that come from their computer codes. When you read the codes, and this was testified to in file, they said the codes meant the person wasn't required to file. The way the IRS explained that mistake was, we relied on what the people told us, and then we sent them the letter that said that they weren't required to file. And then you had the thing about the trust. You had the Felthouse letter, who was a high official in the IRS Vin Salem campus, they call it, that classified foreign returns. And you had another guy named Stacy Williams, who was responsible for classifying entities. He was the director over in Austin, the high sky to classify entities for the purposes of the service center about what returns they should file and what EIN numbers should get. You know what they both said? They said that trust was the type of entity that had no filing requirements under the income tax code. That's what they said, and I forwarded that in the letter. Didn't they later correct that or send a subsequent letter saying, no, that's not the case upon further investigation? No, it's not that clear. The answer is the government searched around the trial and found the letter that mentioned another type of trust, and then they ran it in trying to say, oh, we corrected our mistake. But the problem is that if there was any mistake under the United States versus Bishop, mistakes, and under Dahlstrom, which quoted it, Dahlstrom's Ninth Circuit, Bishop is U.S., under our system of taxation, a mistake, negligence, gives rise to only civil penalties, not criminal indictments and punishments. So to answer your question, thank you for that opportunity. The answer is no, they never corrected their mistake by this record. But even if they had, it wouldn't make any difference. They made this case the stuff of which convictions with a 10-year sentence should not have been made. And that's the thrust of the argument here on the appeal. And let me give you the other pamphlet here. You have Teresa Girodano. Could you back up for a second? I'm still turning over your First Amendment argument in my mind because you have some significant points there. And I want you to tell me what in the indictment and what in the instructions permitted the jury to convict based upon the book? Well, for one thing, Alice released your VRL. The prosecutor got up and said, you don't have to worry about this First Amendment issue about sudden, imminent criminal lawless action. She argued that. We argued that as prosecutorial misconduct. But that's just an example. OK, that's part of the argument. The judge previously viewed this case in such a manner that he made an announcement to us in sentencing, which indicated what he believed to be true. You're not answering my question. I wanted to know what paragraph of the indictment to look at and what instruction to look at to find where the jury might have convicted any of these people just for writing and distributing a book. The indictment has the language that said they counseled the filing of frivolous tax returns. And to me, I mean, that's clear enough. I could find other areas. But look at that. That's the means for the mail fraud and the means for the conspiracy. That's the means for the mail fraud and the means for the conspiracy. Counseled the filing of frivolous tax returns. Doesn't say they're being indicted for writing a book. Where are the instructions? Well, they're not going to say they indicted them for writing a book. It's going to be subsumed in the language in the indictment that the book is included in what they claim they did. You counsel with the book that you publish, according to the IRS. The evidence had a lot more than the book, though. Had a lot more than the book? I've tried to get to that, and I will if I have enough time to explain it. There's some other aspects of this organization. It's not just the book. It was a seminar, and there were letters written to the IRS. Did any instruction say that they can be convicted for the book alone? And did you submit an instruction that the court rejected, saying they cannot be convicted for the book alone? We didn't concentrate, I don't believe, on book alone. What you're specifying reminds me of the deal where they say the mere failure to file a tax return is criminal negligence, but it can't support the felony. The answer is no, we didn't distinguish between the book in that manner that you're talking about. What we did was we asked for instruction on sudden and imminent criminal lawless action. We asked for First Amendment instruction. We did submit it. And here's what the judge told us, and he outlines what he ruled later in sentencing. He said that this case was disturbing, that it might be protected conduct, and he was going to issue a jury a First Amendment instruction, and he did. And that's rare in the cases that you get in tax and on criminal cases. And he gave the jury instruction, which resulted in the prosecutorial misconduct I'm talking about, where they argue against the instructions in front of the jury. Which number of instruction is that? That I don't have, Your Honor. I don't have it memorized where I can give you the number. This is a huge record. I'm sorry. I will send you a letter and give you anything you want that I have stated. We'll send us letters unless we ask for them. I understand. Well, I understand that. The other aspect of this alleged conspiracy, one of them, was the sending of letters. And that was in the context of people asking for collections and process hearing. They were coming after people that had read the book, and they came and they asked for help. The letters are nothing more than an appeal to the administrative remedies, which are also protected under the First Amendment, under the right to petition the court, and under open courts provision and all that under the First Amendment. You can't keep people out. You can't punish them. The limits of your ability to punish them is sanctions for frivolous activity. You can't keep them from filing. An insurer can't criminalize them. And so there was one seminar, but the seminar is just speech. And nobody ever said, she went behind the scenes back there, behind that curtain, took $1,500, $2,000, and prepared our tax returns for each one of us or anything like that. It was pure speech that was at the seminar that was admitted. So you had her books admitted into evidence. Now, this addresses your point. Books were admitted as criminal evidence. And books were objected to for being admitted as criminal evidence. And that's in the record very clearly. The video was objected to, and the court wouldn't let all of it in. And time and memory fades when it's 2004, and you're here in 2012 arguing a case. But I remember some of this like yesterday, and some of it I don't remember as well. But the point is, that's what you have. You have the book. You have the video. You have the trust. And you have the writing of letters, basically. And those letters told people about the trust that they had no income tax filing requirements. I want to make it clear what that means. In our tax system, if you have no filing requirements, you have no tax liability. Now, why is that? Because we're a voluntary system. That means everybody gets together, and the law criminally requires them in the first instance to figure out what their taxes are that they owe, and write the government a note that says, I owe these taxes, and send them in under penalties of perjury. So you have that situation there. And so you have to, in the first instance, put it on a return. If you don't have to file a return, you don't have a tax liability under our system. So they didn't correct that, contrary to what they say. It's just brushed aside, and people get sentenced. Some spend three years in jail. Some spend two. One person, Carl, who was already affirmed by this court, I was not his attorney, he got two or three years in jail. And they wrote him a specific letter and told him that, that the tax return didn't have to be filed. Then there's this idea about social security numbers for bank accounts. Well, guess what? The EIN letter that was written, if you investigate that and look at it very carefully, you'll see that they were refusing to give EIN numbers to these trusts. They were refusing to give EIN numbers to them, and so therefore they couldn't open bank accounts. Why was that? Because if they didn't have a number, they couldn't have an account. Is permissible then to give a false social security number to open a bank account? That's okay. No, that's not what was proven in this case. That's not okay. Is that what the jurors found? They referred to the social security number, and they weren't given to the bank as a social security number. That was called a trust identification number, and the bank did that so the bank could get the money from the depositors when the feds wouldn't give them an EIN number. And I say to you that they wrote that letter to try to keep people from using those trusts, and it backfired on them. Counsel, that EIN number would be given to a trust. Now, you used the term true trust. No, pure trust. Pardon? Pure trust. Pure trust. Yes, sir. When I took the trusts in estates class in my third year of law school, that term was not in the book. Is that something new? Ordinarily, what you'd have is a trust, and there'd be a trust instrument. It's as new as California Supreme Court case Goldwater v. Altman from the 20s and 30s. So what a pure trust is, it's very simple. You have certificates showing your beneficiary in the trust, and the people that hold the beneficiaries' certificates can't order and can't vote and can't tell the trustees what to do. That's what a pure equity trust is, pure and simple. And the code has the 7701 classification definitions when they tell you what your entity is, whether it's a trust or whatever. These pure equity trusts don't fall into that. Was it referred to as a pure equity trust or a pure trust? The record seems to say pure trust, and I don't know whether there's a distinction without a difference or what. There's just an extra word with equity. I don't know what it means. That's all it means. A pure trust means the same thing as pure equity trust. In Massachusetts, business trusts... Is there a trust instrument? Yes, certainly is. And they're in evidence. I could provide you that also, but I don't have it off the top of my head, but they are in evidence. Mr. Eisen, unless my colleagues have any immediate questions, we'll hear now from Ms. Fusilier. Is that the way to say it? Thank you, Your Honor. You're welcome. Thank you. Mr. Wright, let me try to cover a lot of the term. We understand. Good morning, Your Honors. Gretchen Fusilier on behalf of Appellant Teresa Manhart Giordano, and I intend to ask you a few questions before rebuttal. Ms. Giordano's position is totally different from the co-defendants with whom she was on trial. She performed, and the government indicates in their brief as well, nothing more than clerical services. She was working for a law office on the same floor where she... Didn't she write letters to clients? That is a misnomer, Your Honor. She did not write letters. The We the People organization that was promoting the Peer Trust and the program, which Mr. Eisen has been addressing in his First Amendment argument, had presented template letters in their books. Those template letters had been, or were, available to anyone who had the books. All of the persons who were referred to Ms. Giordano's legitimate secretarial business, they had made the decision to file those zero returns before ever coming in contact with Ms. Giordano, before even knowing her name. She was not involved in either the publication, the distribution, the sales, the encouragement to file. She merely inserted into the template letters that were in the books that they had purchased their names, addresses, and social security numbers. In turn, the filers made the further determinations to mail those to the IRS. She did not mail those to the IRS. So that couldn't be considered by the jury an act in furtherance of the conspiracy, inserting those letters into the books? Ms. Giordano did not insert those letters into the books. What did she, you just said she did something with the letters, maybe I misunderstood. The letters were template letters, but that's the zero filers. The letters were template letters, and they existed in books that had been published by Lynn Meredith. So what did they need her for? What did they need Giordano for? They have the book already, they have the template already, and all she does is fill in the name, address, and social security number. What would they come to her for? One of the filers indicated that he went to her because he didn't want to do it himself, because he thought that he would not produce the same kind of a professional letter that existed in the book. She had a secretarial business. This was not her only source of clientele. She had other clients. So the clients that came to her, she would use those template letters. She did not customize them. She did not modify them. She inserted information into them. That's all she did. She inserted limited information. Which enabled them then to rely on the book, is that right? They had relied on the book before coming to her. She helped them first. No, she did not help them. She didn't help them in the process at all. No, she did nothing that they could not have done on their own. She provided nothing that they could... And that she did it for them. Isn't that what happened? They could have gone to a friend, and if a friend had printed it out... I agree with that. But that's not what happened. What happened is that she did, in fact, help them. Is that right or wrong? Isn't that what you're saying? Well, I don't think that she helped them in whatever they were intending to do with the IRS. Let me add an extra feature to what Judge Marbley just indicated. Paragraph 4 in the indictment says, Defendant Teresa Manhart-Giordano also served as a paralegal who would charge taxpayers a fee for drafting protest correspondence on their behalf to the IRS after the taxpayers had encountered problems with the IRS as a result of following defendants' advice. Is that false? Your Honor, again, where is that reference? I'm sorry, it's on page... The GER reference is 2. It's also page 2, and it's paragraph 4, starting at line 13 of the indictment. Yes, that was not proven at trial. It is untrue that she drafted protest correspondence. So the taxpayers who followed the advice ran into problems with the IRS. They bring it to her. She charged them a fee, right? They would go to We The People. Okay, but she worked with her, and there was a fee charged for her service, right? The secretarial service was conducted by Mr. Giordano. Okay, so she charged the fee. She charged $50, I believe. Okay, and the fee was charged to respond to the problems that the folks who followed the pure trust approach had with the IRS. Is that correct? Well, she did insert their name, address, and Social Security number. That was it, and printed it out. Okay, but those were responses to the problems they had, right? They were formed, but they were responses, and there was a fee charged. They were the responses that they chose her to insert their name and address and Social Security name into. Yeah, the fact that somebody else could have done this doesn't change the fact that that was part of the process that was built into this arrangement. If there were a problem, they come to the We The People organization, and they help you out. Isn't that correct? Well, we go back to the intent, I believe, to answer that question, and we have the government witness, Toni Smith, who was an insider with the We The People organization. She and Betty Erickson worked very intimately with We The People. Ms. Smith testified that Giordano, actually following the same program that was proposed by We The People, never indicated anything other than that if what Lynn is indicating and the citations in her book are true, then this is fine. Wait. For a sufficiency of evidence challenge, the evidence has to be taken most favorably to the government. So it really doesn't matter what Giordano admitted or what the other defendants admitted if the jury could infer that Giordano played a larger role than just being a scribe. And I am wondering why the jury couldn't infer from the kind of money Giordano was making, more than $200,000 in one year, high six figures or high $100,000 in other years, that she must have been doing a lot more than just being a scribe filling in a couple of blanks. Well, Your Honor, I believe that the figure that you're referring to, the government has conceded that there was some error in the determination of the amount that she made relative to the assistance in putting the information in and other times. They have conceded some error, but I think the scale, the magnitude of it is still, she's making well into the six figures and claiming all I did was fill in a couple of blanks on templates. Why couldn't the jury draw an inference that she must be lying about that? Well, when we consider the standard of care,  However, after determining that, we, or you, must determine whether or not the inferences were rationally made by the jury. And when you see that the jury acquitted Erickson and Moore, Erickson being the right-hand woman for Lynn Meredith, assisting in selling books, urging the purchase of trust, assisting at the seminars, and Moore actually urging people to buy more trust, indicating, misrepresenting, if you would, according to the... Was there evidence they made this kind of money? I mean, if I want to know what role somebody plays in an organization, if he puffs it at a bar when he's trying to impress a girl, I figure that's not very persuasive. If he minimizes it at trial, saying, I hardly did anything, I was just nothing in this organization, well, that may not be persuasive. And the money they pay him to do whatever it is that he does may be the most persuasive thing. Well, if that's the most persuasive thing, Smith actually left WTP and started a comparable business on her own, doing the same thing. However, the jury acquitted Moore, who was the right-hand woman, acquitted Erickson, excuse me, Were they making the same kind of money as Giordano when they worked for this organization? Your Honor, I don't recall whether or not the income was comparable, but their participation was active, as opposed to the benign activity that Mr. Giordano was performing. And I think when you look at what she did not do, she did not urge the purchase of pure trust. She was honest with the persons who came to her. For example, Mr. Stambaugh. He indicated that she mentioned to him that she considered herself lucky because she was following the same program and had not been harassed by the government or the IRS. She also indicated to him honestly that other persons were having problems with the IRS. There was the testimony of Ms. Osborne, who was the representative called by the government, and she represented the government, indicating that in looking at Ms. Giordano's personal... What is that? The taxpayer's personal file, that there would have been an indication of some action taken against her in the form of executing levies, et cetera, but nothing was in her file. So... You're well over your time, unless any of my colleagues have questions. We'll thank you for your argument, and we'll now hear from the government in the person of Mr. Andre Adler. And may I just say that I've been joined in the First Amendment argument of Mr. Eisenhower. We will consider it so joined. Thank you. Again, please, the Court. John Claude Andre on behalf of the United States in this case. As the Court noted at the outset, there are a lot of issues, and so I, at least for now, absent indication of the contrary from the Court, I will follow Mr. Eisenhower and Ms. Fusilier. Can I focus on one that jumps out at me right away? Jury Instruction Number 55 is very brief, so I'll just read it. It says, Nor is the government required to prove an intent to evade or defeat any taxes. It's on the misdemeanor charge. Yes, sir. And 26 U.S.C. 7203 indicates that that particular statute applies to an individual who, in quotes, willfully fails to pay such estimated tax or taxes, and so on. How do you reconcile the difference between the instruction, which indicated that there was no requirement to prove an intent to evade, and the willfulness requirement of Section 7203? Those instructions, or the various instructions, I think Mr. O'Donnell briefed, those instructions deal with different elements. There are, of course, three different elements for a 7203 charge. Whether there is a duty to file in the first place, whether the taxpayer did not file, and then whether the taxpayer willfully failed to file. Right. And so the requirement that, or at least the lack of an intent to evade, runs to the first element, where the question simply is one of now. On what do you rely for that assignment of meaning? Why doesn't intent stand separately as far as willfulness is concerned? Oh, no, it would. And the court did also instruct on the intent to evade when it defined it willfully. Where in the record did the court's instruction, number 55, indicate that there was a requirement of willfulness? I believe it was actually in instruction 50 or 53, Your Honor. Do you know where that is in the record? One moment, please. Sure. GDR 914. Correct. Well, GDR 914 sets forth the three elements of defense. If you look at GDR 918, that's instruction 53, which talks about the duty to file. And then GDR 920 is also another pertinent instruction. I'm actually going to pull that volume. Okay. I gather your point is that even though the instruction, number 55, did not cover it, another instruction did, and you think that was adequate to cover the requirements of 7203. Yes, Your Honor. In fact, now that I do have this particular page, GDR 920, and this is the instruction, for the crime of willful failure to file a tax return, the very last sentence of that instruction says, the term willfully as used herein is defined elsewhere in these instructions. And of course, the court did previously give a chief willfulness instruction. And that's on 920? Is that correct? 920. Right. All right. Great. So from the government's perspective, 55 doesn't stand alone. You have to include these other instructions, 50 and 53, and that since that referred back, that that takes care of the willfulness requirements. Yes, because of course, it makes some sense for defense to do that in this case, because willfulness, or chief willfulness, was an element of both the 371 conspiracy charge, as well as the misdemeanor failures to file. Okay. And I think that I follow you, but the seeming irreconcilability of 50 and 55 still a bit haunts me. So could you give me a word or two why those are not irreconcilable? Because 50 requires assuring a willful intent to evade taxes. Is that right? Correct. And then 55 states that the government need not prove intent to evade or defeat taxes. They seem to be incongruous on their faith. Perhaps we're speaking about different instructions. I apologize. Instruction 55 says, the government is not required to show that a tax is due and owing. And of course, that makes sense, because the duty to file is triggered by gross income, not net income. And so you could have a case where a defendant has a triggering gross income. They have to file a return. Right. They don't. You know, I think Judge Marbley and I were starting with the same thing. Here's 55 right here. It says, for the crime of willful failure to file a tax return, the government is not required to show that a tax is due and owing from the defendant, nor is the government required to prove an intent to evade or defeat any taxes. That doesn't refer back to anything else. Nor does anything else necessarily refer to that, because it's very specific about this crime, which is under 7203. Right. And it's because the defendant, for whatever reason, let's say, I mean, let's take like an Al Capone type example. You have someone who just doesn't want to be on the federal government's radar, even though they may not, in fact, be trying to evade taxes. They just don't want the government looking in their books. And so there, the government doesn't have to show an intent to actually evade taxes. The government has to show a willful refusal to file a return that otherwise is required based on the gross income. Maybe I'll call it a bad example, but, you know, some kind of criminal where... Might be a good one. He said he never made any money. It was all show. He had business expenses that ate up all his income. But that's my point. It's that, you know, there are a number of reasons why someone may not want to file a tax return. And if they know that they have that duty and they don't do so, it's irrelevant whether they actually had... We're going to get a refund. We're going to owe no taxes. We're going to owe taxes. I hope that answers the court's question. Help me on Giordano for a moment. We may come back to this. Taking the evidence most favorably to the government, what enabled the jury to conclude beyond a reasonable doubt that she was guilty of the crime charged and that she wasn't merely a scribe? Sure, Your Honor. First of all, Giordano was not just a scribe filling in names into forms. Certainly, there was a large component of her conduct that can be described that way. But she interacted with these clients that were referred to her by real people. And based on the information that they sent her relating to their tax problems, she would then sell them one or another or sometimes multiple rounds of documents. And so while that may not be down-in-the-weeds tax advice, she certainly was engaging in more than just saying, oh, you want me to take page 23 of Lynn Meredith's book and type it up pretty on my word processor and insert your name. Additionally, as Judge Clanko, you pointed out, her income skyrocketed as a result of this scheme. And based on the information the clients gave her in their individual personal interaction, she decided which of the templates to use? She would make a recommendation to them as to what they should buy, whether it should be a $40 letter packet or a more expensive motion packet. And it also depended on where these clients were in the stream. Were they just getting a notice of deficient tax return from the IRS or were they already at, for example, the notice of intent to levy stage? Was she trained by Ms. Meredith? Yes, she was. She was trained by Ms. Meredith. And I don't want to undersell that or oversell that. I think Ms. Meredith showed her how to use the templates that we had made. Ms. Meredith created and put on the computer. But they also interacted. They worked in the same office originally a couple of days a week for a couple of years. And then she was allocated more and more regularly. And she sat next to Tony Smith. And over time, she eventually started actually even handling customer complaint calls. Were there any instances in the record where she individualized these letters, got it out of the template other than just name, address, and social security number? I'm not aware of any, Your Honor. I mean, the one other thing that she did do, contrary to Mr. Vassilier's claim, that she did things that only these clients could do on their own, she notarized documents for them that they weren't even present for. So I mean, not only do you have her performing a specialized function, she's also doing it in contravention to her duties to the state of California as a notary, which when you add up the total mix, along with the other evidence I'm about to discuss, certainly allows a rational jury to conclude that she had the requisite criminal intent. California requires notaries to have a book in which the person whose signature is being notarized signs. If there's real property involved, they have to do a thumbprint and the like. Did she do that with any of these folks? I don't know how. We did not seize her book. Okay, so that was not an evidence then. No, it's not an evidence. I mean, certainly clients of hers who testified at trial said that they paid her their fee to get these correspondence to the IRS or the motion packet, and got it back from her with the notary seal and her signature already on it. Okay, so there's independent evidence that she did that. I guess in this case, with respect to Ms. Giordano, that's really just a conspiracy point they're charging her with, right? That's correct? Or were there separate? There also were failures to file. We charged a conspiracy and then separate failures to file against all defendants. With respect to Ms. Fichelet's point that the government's concession on restitution somehow undercuts our reliance on her skyrocketing income, we just, I don't believe that that will hold any water. If you look at, this is in the GESR, the thin sealed volume of government tax service, that is where Ms. Giordano made her proffer of various tax returns that she was going to file or had filed in advance of sentencing to clean up her tax obligations with the IRS. And certainly those income numbers on the face sheet, because that's all she provided, she did not provide full tax returns for any of the years, just the front page. The business income numbers are certainly lower than the lost numbers that the government relied on at trial with the summer witnesses. But we don't have the Schedule Cs to know, I guess, as with Al Capone, what kind of business deductions she was claiming were eating up all of her net income, I mean, all of her gross income. So I don't think it undermines confidence. And if you do look at the numbers, they're still quite high. They're all in excess of $50,000, some years up over $100,000. Either way, she's making a lot of money over this. And it certainly allows a rational juror to conclude that she had a motive for doing what she was doing. On that restitution point, though, we acknowledge that the proffer of those tax returns requires her restitution issue to go back. I'm trying to sort out here, pick for Giordano. Sometimes in third world countries, you have public scribes and people come to them and say, I want to write a letter to my husband saying I love him very much. And the scribe may do that verbatim or may make up her own flowery letter and write it. That's not the situation. Sometimes people go to a law office in a particular specialty where exact words have to be used again and again, like say in a warranty deed or a deed of trust. And there the lawyer may just dictate to a secretary, or I don't know if they dictate anymore, they probably do it on their computer now, what name and address and such to fill in the blanks. But the lawyer decides whether it should be a warranty deed or quit claim deed or a deed of trust some other sort of document. And there's a whole lot of judgment and discretion that the lawyer is exercising. I gather Giordano was somewhere between somebody who just mechanically fills in what somebody tells him and the lawyer who's exercising all that judgment. What did the evidence show about what she did? Well, the evidence showed, for example, that I believe it was a victim or a client at a direct home that when he went to her and told him about the problem she was having, she said you should try this motion packet for $455 instead of just the correspondence letter. I mean, I agree. She's somewhere in between. She's probably closer to the scribe bookend than the lawyer's bookend. But even with that being the case, the evidence was still sufficient in light of the deference that this court owes the jury verdicts under Jackson and Nevels. So the key here is she tells him don't do the $40 deal, do the $455 deal. Right. Based on the information he is providing. And of course, with all of her clients, part of what she's doing is she's telling them send me the correspondence you're receiving from the IRS so I can, you know, give you the appropriate form. And it doesn't require a lot of judgment. I acknowledge it's fairly formulaic, but she's not just simply taking a dictation and typing it up. There is more interaction. For purposes of the conspiracy count, would she have had to do any more than to correspond with clients and recommend one of these packets? Would that have been sufficient to convict her? I think for profit. Conspiracy, yeah. Yes, for profit. And I'll add, with the requisite knowledge, when I look at Ms. Giordano's case, I've always thought that Ms. Fusilier's best claim is that she has insufficient knowledge. We still think we gave enough circumstantial evidence to the jury for the jury to reject that. I mean, that's really a Nevels step two analysis, not a Nevels step one. And the knowledge would come from the fact that she was looking at all of her clients' correspondence from the IRS, where the IRS was steadfastly saying, this isn't working, this isn't working. She had her own dealings with the IRS, and the government disagrees with Ms. Fusilier's characterization of the interaction with Kevin Stanbaugh. In Mr. Giordano's testimony, or sorry, in Kevin Stanbaugh's testimony, he was first asked about the protest correspondence and the motion packets. And he then said, Giordano said she'd been doing this for years and was not being bothered. Now later, he also said what Ms. Fusilier quotes, which is that, you know, he wasn't being harassed by the IRS. Well, okay. So you have two pieces of testimony that you could parse differences from. That's what the jury is there to do. The testimony we're relying on is that he said she had told him she was filing this kind of correspondence with the IRS and was not being bothered. And in fact, six months earlier, she had a notice of intent to levy sent to her. So for purposes of Jackson and Nevel, it's really kind of a closed issue as far as the government's concerned, because even though this evidence may not have been fulsome, it did tie her to that. The jury weighed the opposite position that was advanced by the defense and chose not to believe it. Is that a fair summation? Exactly, Your Honor. Exactly, Your Honor. This was a triable case, particularly for Ms. Giordano, but we produced enough evidence to show that she was a knowing participant in the scheme and that the jury could reject her claim, which is basically what she's arguing here as well. She was duped or seduced by Lynn Meredith with Lynn Meredith's fancy ideas about tax evasion. Let me ask you about those ideas. I think there probably is a First Amendment defense if somebody is charged with conspiracy with their literary agent and publisher to cause people to evade taxes if all they do is write a book. I'm not sure whether it's clear or not from the way the case was presented to the jury whether Meredith and the others could have been convicted on account of a bad book. My problem with books that say false things, they can be just grossly, outrageously false. And I still think there's a First Amendment protection. My gosh, I bought Marxist Das Kapital and I bought Hitler's Mein Kampf. I've also bought numerous books that are less egregious, but I think two-thirds of the books I buy on current affairs have all sorts of nonsense in them. And surely there's a First Amendment protection for that. Was it clear to the jury that they couldn't be convicted just because of the book? I believe it was, Your Honor. Why? Show me exactly. The book did go to the jury as an exhibit, as evidence. Yes, a number of different editions of the book. And the nice thing about something like that is it's concrete and it's nonsense. Well, just to tag on to Judge Kleinfeld's question, the book was presented to the jury for what purpose, or the books? It was part of an integrated scheme. I mean, and so our position is that, and I take one of them digressionally, Mr. Eisen has mentioned the Schiff case, which fortunately I'm prepared to address even though it wasn't cited in the briefs. I actually think the Schiff case pretty much is the end of any challenge to the indictment in this case. The Schiff case would be 379F3-621. That's a prior restraint preliminary injunction case from this court from 2004, where the court enjoined the release of a book called The Federal Mafia, which basically is Lynn Meredith's book. And while Schiff may have been doing other things, the fact that it's a prior restraint preliminary injunction case means it really was just about the book. And of course, as we all know, prior restraints are even more disfavored. It worries me just relying on that because it's not a Supreme Court decision and it is a prior restraint on a book that's really kind of sticking our chin out there. Well, I realize that, but it is a binding precedent of this court. I agree. And prior restraints are more disfavored than... The precedent can be limited or distinguished sometimes. So I want to be confident that it's right. I understand. You know, I've read it a number of times and don't see how it really can be distinguished. And there the court said, this is fraudulent commercial speech, and so we're done. The court also recognized the two analyses that we were relying or we relied on below and that we were relying on here, which are that this is incitement speech and solicitation speech, and therefore the defendants are... The indictment stage stripped of presumption of protection. I don't think I made my question clear enough to you. My apologies. If it's the book in combination with the counseling and the filling in of forms and the mailing off of forms, that's one thing. The book may be evidence of intent and all sorts of stuff in connection with those things. But if the jury can convict on the book alone, even if it thinks somebody didn't do all those other things, that's where I have to really confront Schiff. Correct. And I'm wondering, could the jury convict just on the book? I have the personal instruction from your Honor, and I... I have it too, 39 EBR 901. Is that what you're looking at? Yes. And I will concede that as I stand here, I'm not sure. We certainly didn't argue the case that way. And I don't recall the court ever giving an instruction that says... How did you argue the book? We argued it as part of this integrated scheme, that, you know, that the defendants, or that Lynn Meredith wrote this book. It contained lies. She went and put on seminars where she peddled the book and then peddled the trusts that were discussed in the book. And in fact, in one occasion, in one of our... When we have an undercover agent go to one of these seminars, they offered a special deal. If you go over to the table and buy the trust right then and there. And that then, if people were having problems with either the zero income aspect of their program, which was detailed in earlier versions of the book, or with the trust, that then you could come back to them and they would refer you to Giordano, who would charge you for the letters that they would be sending to the IRS. And so when you have this full integrated scheme, yes, on some level... There was a professor a couple of years ago by the name of Belisles. And he wrote a book saying that in colonial America, nobody had their own guns. They kept them down at the armory and people died. They had no guns. And he went around giving a lot of lectures to that effect. And what's more, he was promoting activity, which was the deprivation of what the Supreme Court decided in Heller were constitutional rights. But I can't imagine that Professor Belisles could be indicted for lying in his book. And the evidence later came out that he just flat lied. He said he'd looked at estates that were probated and he hadn't. The records didn't exist. He just lied. Right, the old county record office and all that. That's right. Decades before, absolute story. I think the critical distinction is that his conduct there or the money he made was from selling the book, I think it was the Oxford Press, it was a record from the press. And then from his speaking tours. He probably made a whole lot of money from his speaking tours. Universities sometimes pay celebrity speakers as much as $50,000 just to come and give a talk. Absolutely. Those two acts, the full universe of what he did was speech. And arguably, pure speech. Whereas here, once you start dabbling in providing forms that, if you know they're false, and again, you're in the fraudulent commercial speech area if you're charging for that. But then also you're inciting people to commit lawless acts. And to touch on Mr. Eisenstein, there was a lot of interaction. In fact, they had offices where clients would come in and discuss the pure trusts and then would have the employees of We the People and Sovereignty, pure trusts, act as trustees of the trust. That's just a level of involvement that transcends pure advocacy and I'm sure transcends what Professor Ballil did. I have a question, Chris. What about the eminence argument that Mr. Eisenstein made? What type of right line rules should we look at? Would three weeks still fall in the range of eminence? Or would you have to do a deeper dive as Judge Kleinfeld has suggested? Because this is something that takes a little, this is one of those crimes that takes a little bit more time to perfect than filling a Molotov cocktail. No, absolutely. I'm not going to sit here and try to jam this case into Brandenburg. They're really apples and oranges. I don't have a bright line rule to offer. I think the courts need to take a pragmatic approach to it when we're talking about, you know, fraud, white collar crimes where the eminence is measured or is perhaps immeasurable because there's necessarily built into it some kind of potential for cooling off. I want to follow up on this on jury instruction number 39. The instruction clearly acknowledges a First Amendment right to speak. And specifically here, this means that the expression of a belief that a law is invalid or unconstitutional is protected by the First Amendment. But then it goes on to indicate that the defendant's arguments here are protected unless one of the following are present. One, the defendant intended to incite others to imminently file false claims for refunds or to hide their income from the IRS. Now, the imminent gets to the concept that Mr. Eisen mentioned. Is it the government's position that, assuming for a moment, that there were no filing of forms, no helping with protests, nothing else, let's just say there was a book out there, this particular book, would that book in and of itself meet the requirements of this subparagraph 1 of the jury instruction number 39? I think it would be, I think it both could and it could not based on the particular facts framing it. In other words, the publication of the book would not be enough. But if someone bought the book and went out and immediately followed it, I think it would satisfy. So from your perspective, just the book alone, I understand from a conspiracy perspective we've got all these other things that the entity was doing and that the people were doing. But just the book alone, I go to the seminar, I buy the book and I have it there and I don't look at it right away, but it comes to hack time. I look at this and I think, oh, the government just drives me crazy. I can't stand this. This makes a lot of sense to me. So I follow that. I set up a trust and I do all the things that are indicated there. Does that mean that the book alone meets that requirement of specifically here, I have been incited to imminently file false claims for refunds or to hide income? I think the court's instruction, in particular, if we turn to the next page, protects against that situation because the court described the word imminently to me. It is the word imminently quite near in time too. Now, I think this court's case law... What does that mean? The judge left it up for the parties to argue. I think this court's case law actually allows for an even broader time period... But certainly if you had the book for two years, that wouldn't, under anybody's definition, qualify as imminent, would it under even this definition? No, that's correct. Was there any evidence introduced in this trial that showed how long after people attended the seminar and bought the book that they filed these returns? Not that I recall, but there certainly were people who bought trusts pretty much on the spot because that was one of the reasons. I see. That's the buying of the trust. The problem here is filing with the IRS. Right, but I think that the trusts really are just the middle piece of the same triptych in that in the cases that Mr. Eisen's attempt to distinguish, yes, you had people who were more actively involved in the preparation of tax returns, and I believe Mr. Eisen said something to the effect that none of these defendants were involved in the preparation of their client's tax returns. But what they did instead is they solicited their clients into or incited their clients to buy these trusts, which then became the vehicle for filing a fraudulent tax return. I understand. What you're arguing about this, I remember reading with horror the World War I prosecutions against people that were advocating against arming our country and going to war with Germany. And a lot of them were prosecuted. Now, that wouldn't happen today, but they were prosecuted for what they said. There was no proof of anybody ever having followed up on it. I think it was even Eugene Debs or somebody was indicted and convicted. And Oliver Wendell Holmes, Jr., of all people, agreed with it. This troubles me. I'm a little concerned about how this instruction squares. Again, just look at the book alone. I get the conspiracy part and all that sort of thing, but just the book alone and that instruction, I'm troubled by that. This concept that you can read this and if it incites people to not file a tax return, it is criminal. And yet, as Judge Kleinfeld indicated, we have people all over this country who make outrageous claims in books of all kinds that encourage people to do any number of things, some natural, some unnatural, and this is no problem at all. It's just part of free speech. Why isn't this the same? Again, it's absent the other stuff. No, I understand it. Because Judge Fragerson actually gave, at least under this court's current case law, which perhaps the en banc court might someday revisit, but his instruction is more limited than what this court approved of in Freeman. In fact, Freeman was discussed extensively during the five and a half days that Judge Fragerson was going over jury instruction. And in that case, the court said that imminence is defined as a lawless act likely to occur. Well, that is, to me, seems more remote than quite near in time. And, you know, so Judge Fragerson struggled with this. He tried to come up with an instruction that would account for the fact that this is not a mobsling. It's not Brandenburg. But at the same time, you do need some imminence. And I think that this instruction, even if you just look at the book, it adequately gave the defendants the opportunity to argue that whatever their clients did was too remote, and the jury could resolve the case that way. It also gave the government the opportunity to come in and say, no, no, the defendants knew what they were advocating. But there was no evidence of imminence, was there? I mean, there certainly is evidence in the weeks and months. The buying of the trust. But I mean, in terms... I want to be sure of this. Was there any evidence, as reflected in the record, that the government put in that showed that all or any of the taxpayers who bought this book acted on the advice of the book imminently? I don't think we drilled down on it that way. Okay. We probably could go back and divide, because there were a number of our... A number of the witnesses we brought in said that they came and actually went into the We the People offices to talk with Lynn Meredith after having bought the book and followed it. And so there certainly are people who bought the book and relied on it. We just haven't... But going in to talk to Lynn Meredith was not in itself criminal. Oh, no, but that was the opposite. It was an entree to then purchasing a trust and purchasing gerodontics. Well, then does that intervening act somehow attenuate the time period problem? I don't think so, because the... Again, to stick with this example... So they read the book, they go and talk to Meredith, and then they do fulfill some criminal act. So does talking to Meredith break the chain at all? If I could clarify the fact... In the example I'm talking about, and I know we've summarized these various witnesses in our briefing, the defendant would read the book and then follow its rubric, for example, the zero income tax return, send it in, and then it wouldn't work. And then they would go meet with Meredith to figure out what to do next. So the actual, the lawless act was in response to reading the book. And as I think you've told Judge Smith, you don't know how much time there was between reading of the book and following the zero income tax return. No, not as I stated earlier. I'm happy to divide it. So there's no evidence in the record from which a juror could glean evidence? I think there would be. Again, we didn't argue it that way, because we didn't believe... Okay, well, why would that be? If you didn't deduce the evidence, where would the evidence come from? Well, because, for example, some of our witnesses said, I bought the book, you know, in X month of X year. And then those same witnesses discussed their fraudulent tax returns with my colleagues when we were examining them. And those tax returns are signed and dated. And so the dates are there. So I said, we can divine whether there was imminence. It's just the issue wasn't kind of presented. There wasn't anything for us to focus on. Well, no, what you can divide is the time period. But then wouldn't it be for the juror to determine whether that constituted imminence? Who determines imminence in this instance? Well, in this instance, it was for the jury to make the call. But certainly, again, I'm not saying this is the case. But if I were to go back and look at all the records, I might be able to find an example where the witness said they bought the book in August 1997. But Judge Marbley's point, though, and from my earlier one, it stands to reason, does it not, if no evidence was introduced by the government about the time period between the purchase of the book and the filing of the false return, the imminence requirement could not be reasonably found by the jury? You can't deduce something from nothing, right? No, that's a fair point. But again, we did argue this point, again, not in terms of dates or weeks or months, but we did argue that our victim witnesses bought the book, followed it, it didn't work, and then everything else that I've discussed. And they heard the testimony where they did mention dates and where the dates were on the tax return. Do you have any defendants of these three who were convicted where they never went into the office and got any papers, all they did was buy the book, read the book, and follow the book? I'm sorry, Judge Michael, I maybe don't understand. Here's what I'm trying to figure out. I just don't buy your point that the book would be enough by itself. I just don't buy it. I don't see the imminence even comes into it. I mean, gosh, back in the days when I did my own taxes, I might have bought a tax book in May because it would be half price and not looked at it until the following March or April when it was time to start working on my taxes. I can't, but I'm thinking, does that matter in this case? And I've got these three people, Meredith and Byvie and Giordano. And could any of them have been convicted because someone bought the book and acted on it and that's all? Or were all three of them in positions such that the overwhelming evidence was that somebody came in and they did forms for them or wrote letters for them or did something subsequent to the book that was part of the conduct that was charged and proved? Our position is that, and kind of unpack it into two separate questions, if I may. Our position is that, yes, theoretically, someone could have bought the book, acted upon it, and if they did so close in time, then these defendants could be prosecuted for the book. Now, of course, that is the law. The book alone. Of course, that's not what we have here. We do have this fully... What we have here is what I was asking about. And what we have here is this fully integrated scheme where there were all of these steps and the only parts that are arguably even covered by the First Amendment are the book and the seminars. And so at that point, once you add it all up, it's just more than enough evidence for the jury to... It was enough to allow the defendants to get a First Amendment instruction, which was something that wasn't... On Meredith, people came in and talked to her and she did other papers for them when they came in and talked to her? Yes, or sold them trust, told them lies. Did people come in and talk to her and she did other papers for them after they came in? And Giardano, you've already said. Giardano, closer to the scribe, but yes. So as we wind up here, we could talk about this case forever and it's a very interesting case, but what would the government like us to do with the book part? I mean, you could tell we're all troubled by the book part. We really are. And the jury instruction is a jury instruction and unless you can point me to something else, it seems pretty clear that the First Amendment instruction says there is this right, but you meet these exceptions, the First Amendment is not going to help you. And the exceptions all deal with imminency, which is defined on the next page of the instruction. There's no evidence so far as you've been able to indicate at this point. That any of the victims, we'll use that, your terminology, did that, that they looked at the book and imminently filed. What would you like us to do with that? Do you want us to look at it and I'm not going to say we're going to do it. I'm just saying if the government had its druthers, how would you have us treat the book as intent as part of the other things and if so, how do you distinguish the effect of jury instruction number 39 or do you want us to really consider the book in isolation? How do we deal with it? I think the first part would be to say that under Schiff, the speech in the book or the book itself, you know, can form the basis of prosecution and it's fraudulent commercial speech. The district court did not, although defendants complain about jury instruction, in fact, they don't actually complain. I just want to say, I do want to point out, they don't actually complain about instruction 39. They never, they are not renewing their objections to that instruction or appeal. But anyway, defendants complain about the First Amendment. They argue that any unlawful acts by the victim's clients were too remote. The district court, you know, certainly didn't abuse discretion in defining imminence the way it did in light of the fact that this book alone could have been the base for prosecution under Schiff. On the basis that it is fraudulent commercial speech. But here the district court gave the jury instruction which arguably elevated the government's burden and allowed the jury to reach the conclusion whether the victim's conduct after buying the book or after meeting with Meredith or after attending the seminar was sufficiently close in time. And we find no abuses of discretion in the court putting that question to the jury. Well, the court's run your way over. Go ahead. Do we need to cite Schiff? It strikes me as kind of a certain invitation to cite and follow Schiff. And I'm wondering whether we need to if we decide that you're correct on some of the ground. Well, no, I don't think you do. I was trying to address Judge Smith's question narrowly. I think that you can cite Solomon, Shulman, Smith, George, Freeman all the cases that we rely most heavily on for proposition that when you have speech bundled with fraudulent profit-taking acts and interactions with individuals, you just are pretty much out of the First Amendment area. At most, it's a jury question. Judge Patterson put it to the jury here. They rejected it based on sufficient evidence. And we're done. Thank you very much, all, for your argument today. The case, just argued, is submitted and the court is adjourned for the day. Thank you very much.
judges: Marbley, Kleinfeld, Smith